# **AFFIDAVIT**

Richard C. Bernecker, first being duly sworn, deposes and says:

1. I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) in the Cincinnati Resident Office (RO) and have been since August 2012. Prior to my assignment as a Task Force Officer, I was a Patrolman and Detective at the Colerain Police Department. I have been employed as a police officer for sixteen (16) years. As a Task Force Officer with the DEA, my duties have included investigations of violations of federal laws concerning the importation, manufacture, possession, and distribution of controlled substances as defined by Title 21, United Stated Code, including controlled substances such as heroin, cocaine, methamphetamine, and other dangerous drugs. During my tenure as a police officer, I have participated in numerous investigations involving drug trafficking and have attended numerous specialized training schools conducted by the DEA and other law enforcement agencies. Some of the training I have attended includes: DEA Basic Investigators School, Operation Jet-way Training (training that is specialized to airplane, train, and bus interdiction), Interdiction Training and many more. I have participated in all aspects of drug investigations, including physical surveillance, undercover operations, execution of search warrants, interdictions, and arrests of drug traffickers.

2. I have learned through training and experience that drug traffickers and their couriers often fly on one-way tickets and usually do not make travel plans much in advance because they get last second information that the narcotics are ready or instructions and they have no idea how long the transaction will take.

3. The information in this Affidavit is based on my personal investigation and does not include all information obtained during this investigation, rather only that believed necessary to provide a legal basis for the civil forfeiture.

4. On December 15, 2021, agents from the DEA Cincinnati Resident Office received information from Transportation Security Administration (TSA) that Carlos Manuel Cruz-Zuniga came through the check point with a large amount of U.S. currency. Cruz-Zuniga was traveling with Kayla Wray Saylor on a suspicious flight itinerary: their round-trip tickets to Los Angeles with a one (1) day turn-around were purchased four (4) days prior to travel.

5. I responded to the departure gate accompanied by TFOs Eli Sautter and Nicholas Nimeskern and Airport Police K-9 Officer Rob Minter and Detective Joe Moyer, to await the departure of the flight to Los Angeles. I approached Cruz-Zuniga, identified myself as a police officer and asked if we could speak to him. Cruz-Zuniga verbally consented to allow the agents/detectives to speak to him. During the consensual encounter, Cruz-Zuniga was standing in the entrance of the jet-way free to walk away at any time. TFO Nimeskern interviewed Saylor separately.

6. Cruz- Zuniga presented an Indiana driver's license that displayed the name, Carlos Manuel Cruz-Zuniga. I explained to Cruz-Zuniga that we are part of an

interdiction team looking for large sums of money and/or drugs related to narcotics and/or terrorism. I asked him if he was traveling with any of the mentioned items and he responded that he had about $46,000.00 in his carry-on bag. I asked for permission to search the carry-on bag and his person and Cruz-Zuniga verbally consented to allow the searches.

7. I located two (2) cellphones on Cruz-Zuniga's person and in his carry-on bag large rubber banded bundles of U.S. currency which consisted mostly of $20 bills and smelled like marijuana. I asked Cruz-Zuniga what the cash was for, and he said it was to buy shoes and showed me an Instagram post of some different shoes. I explained that the Instagram post didn't show proof that he was buying or selling anything.

8. I asked Cruz-Zuniga what he did for employment and how the U.S. currency was obtained. He said he owns a shoe company and that all the U.S. currency in his carry-on bag was from his business. He then showed agents some paperwork of the business. TFO Sautter noticed that the business was just established six (6) months ago and he also located a marijuana license in the stack of papers. TFO Sautter ask about the marijuana form, but Cruz-Zuniga refused to provide an explanation. I asked Cruz-Zuniga if he had any proof of his business or banking and he said all he had was the papers he showed us. I asked if the cash came from a bank and he said it did not. I then asked why they were flying out of Cincinnati when the Dayton airport was closer, and he claimed that Cincinnati had better flight options.

9. I asked Cruz-Zuniga if agents could look through his two (2) cellphones to make sure none of the U.S. currency was tied to narcotics. At this point, Cruz-Zuniga became extremely nervous and started to fiddle with the cellphones. Concerned that he might try to erase evidence, I asked him to set the cellphones down. Cruz-Zuniga would not consent for the search of his two (2) cellphones.

10. While I interviewed Cruz-Zuniga, TFO Nimeskern was interviewing Saylor. She presented an Indiana State driver's license displaying the name, Kayla Wray Saylor. TFO Nimeskern explained that we are part of an interdiction team looking for large sums of money and/or drugs related to narcotics and/or terrorism. Saylor replied, "I have money, but I only have 100 bucks." TFO Nimeskern advised Saylor that we were looking for large sums of cash and were not concerned about $100.

11. Saylor verbally consented to searches of her carry-on bag and her person. The only item of evidentiary value found was a cellphone. Saylor told agents that she was dating Cruz-Zuniga, but he had other girlfriends.

12. Saylor said she is a nurse and she believed Cruz-Zuniga does roofing. Det. Moyer asked Saylor if Cruz-Zuniga was involved in drug trafficking, and she stated, "Who knows, he does some shady stuff." Det. Moyer asked Saylor if any of the U.S. currency located in Cruz-Zuniga's carry-on bag belonged to her and she said no.

13. Saylor gave Det. Moyer permission to look through her cellphone where he found nothing of evidentiary value. However, he did find a text conversation with Cruz-

4

Zuniga about the trip in which Saylor seemed confused about the trip. Det. Moyer asked her about the trip and the quick turnaround, and she said he told her he would be taking her shopping and she was confused on why they were doing such a quick trip.

14. I advised Cruz-Zuniga and Saylor that the cash would be seized based upon probable cause that it was proceeds of trafficking illegal substances and that we were seizing his two (2) cellphones and would apply for a state search warrant. Cruz-Zuniga and Saylor decided not to board the flight to Los Angeles, and they left the airport after the consent encounter. Cruz-Zuniga and Saylor were the only persons present at the time of the searches and seizure.

15. A state search warrant for the cellphones was obtained, however, agents were unable to access any data on them due to security protocols.

16. The currency carried by Cruz-Zuniga, later found to total $45,044.00, was seized based upon probable cause that it was proceeds of drug-related activity or intended for such use. Several factors contributed to the officers' belief that there was probable cause that the seized currency was proceeds of drug-related activities, including:

    a. travel on recently purchased airline tickets with one-day turnaround to known source city/state;

    b. no proof of legitimate source for the cash;

    c. conflicting stories of Cruz-Zuniga's employment;

    d. refusal to allow agents to look at cellphones;

  e. large number of $20 bills—1681—$33,620;

  f. the cash smelled like marijuana; and

  g. positive indication by a drug dog.

17. On or about March 15, 2022, Carlos Manuel Cruz-Zuniga filed a claim in DEA's administrative forfeiture proceeding to the $45,044.00 seized from him.

For the above-stated reasons, your affiant believes that the seized currency was furnished or intended to be furnished in exchange for controlled substances, was proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics and is, therefore, subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881 (a)(6).

I declare under penalty of perjury, as provided by federal law, that the foregoing statements are true.

This __9__ day of __June__, 2022.

*Richard C. Bernecker*
Richard C. Bernecker, Task Force Officer
Drug Enforcement Administration